# N. Y. SUPERIOR COURT.

MICHAEL GILMAN, as administrator, agt. HENRY McARDLE.

*Trusts for pious purposes — When attempted trusts for such purposes will be declared void — When trust fails for want of a beneficiary — Right of a legal representative of a husband to sue for a chose in action belonging to the wife at the time of her death, and not reduced to possession by the surviving husband during his lifetime.*

The right of a husband to administer upon the estate of his deceased wife confers upon his legal representative the capacity to sue for a chose in action belonging to the wife at the time of her death, and not reduced to possession by the surviving husband in his lifetime.

Moneys belonging to the wife of plaintiff's intestate were placed by her in the hands of defendant, with the direction and upon the condition that after the death of herself and her husband he should use the fund to have masses said by a Roman Catholic priest for the repose of their souls:

*Held*, that though such a use is not void upon general principles of public policy, and the trust is not invalid, because it relates solely to personal property, nor because it was not declared in writing, yet it cannot be upheld, because there is no beneficiary or *cestui que trust* in existence, or capable of coming into existence under it; and if the trust fails, the disposition made of the money cannot stand, because it amounted neither to a gift nor to a disposition by last will and testament. There was only a mere naked deposit of money into the hands of the agent, with certain instructions concerning the employment and payment from time to time of a third person, namely, a Catholic priest, for services to be rendered, and the principal may at any time revoke the instructions and recover his property, and if he does not do so in his lifetime, and dies intestate, his death revokes the authority of the agent, and as the title must go somewhere, it goes to the administrator of the intestate. From the moment the administrator objects, the agent must cease paying out. But up to that time he will be protected for acts done in good faith.

*Special Term, July*, 1883.

*John Brice* and *William Suydam*, for plaintiff.

*C. W. Bennett* and *Richard L. Swezy*, for defendant.

FREEDMAN, *J.* — This is an equitable action brought by Michael Gilman, as administrator of the estate of James

Gilman, deceased, and its object is to have a certain trust declared null and void, and to compel the defendant, as the alleged trustee, to account.

On the 23d of August, 1882, Margaret Gilman, then about eighty-five years old, placed about $2,300 of money belonging to her into the hands of the defendant, with the direction and upon the condition that, after the death of herself and her husband, who was then over ninety years of age, the defendant should use the money, in the first place, to pay funeral expenses and erect a suitable monument to their memories; and, in the second place, to have masses said by a Roman Catholic priest for the repose of their souls.

About eight days after the delivery of the money to the defendant — viz., September 1, 1882 — Margaret Gilman died intestate and without issue, and on the thirteenth of October following, James Gilman, the husband, also died intestate.

The plaintiff, as next of kin of James Gilman, took out letters of administration on the estate of James Gilman, and, as such administrator, demanded that the defendant account for and pay over the money received by him, and upon defendant's refusal to do so brought this action.

The theory of the action is that at least the second use or purpose of the trust is contrary to public policy and wholly illegal and void.

The first question that presents itself is whether the plaintiff has legal capacity to maintain the action. Its determination depends upon the correct solution of the further question whether the right of James Gilman to administer upon the estate of his deceased wife conferred upon the plaintiff, as his legal representative, the capacity to sue for a chose in action belonging to the wife at the time of her death and not reduced to possession by the surviving husband in his lifetime.

At common law, marriage was an absolute gift to the husband of the personal property of which the wife was actually possessed, and of such as came to her during coverture.

As to choses in action, marriage was only a qualified gift,

conditioned that the husband reduce them to possession during the existence of the marriage relation.

As to all personal property possessed by the wife at the time of the marriage, and such as came to her during coverture, and also such choses in action as the husband reduced to possession during coverture, the title was vested in the husband, and upon his death, such personal property and choses in action went to his representatives, and not to the wife ; and if the wife died first, they were his after, as they were before her death, and no administration was necessary.

As to choses in action not reduced to possession during marriage, if the wife survived the husband, they went to her, and, upon her death, to her representatives; but if the husband survived, he had the sole right to administer for his own benefit and enjoyment in preference to the next of kin.

These common-law rights of the husband, and the consequences flowing from them, are still recognized in this state in the case of a wife dying intestate, leaving no descendants and a husband surviving.

The statutes of this state give to the wife the control of her separate estate during her life, and she may dispose of it by will. In case of a will, the testamentary disposition stands. In the absence of a will, if there are descendants, the succession is regulated by the statute of distribution. But in case a married woman dies intestate, and leaves no descendants, the common law right of the surviving husband to administer his deceased wife's estate, and through such administration to acquire the title to her personal property and choses in action not reduced to possession during coverture, subject only to the payment of her debts, still exists. This has been expressly decided in *Burnes* agt. *Underwood* (47 *N. Y.*, 351). And in all cases it is now provided by statute that in the case of a married woman dying intestate, her husband shall be entitled to administration in preference to any other person (3 *R. S.* [6th ed.], 78 ; *formerly sec.* 27); that if he shall not take out letters of administration on her

Gilman agt. McArdle.

estate, he shall be presumed to have assets in his hands suffi-
cient to satisfy her debts, and shall be liable therefor, and that
if he shall die leaving any assets of his wife unadministered,
they shall pass to his executors or administrators as part of
his personal estate, but shall be liable for her debts to her
creditors in preference to the creditors of the husband (*Id.*,
sec. 33 ; *formerly sec.* 29).

From the foregoing it is clear that if, upon the death of
Margaret Gilman, her husband, James Gilman, had taken out
letters of administration upon her estate, his right of action
against the defendant now here would, upon his death, have
passed to the present plaintiff, as administrator. But as
James Gilman did not do so, it is necessary to determine
whether that omission affects the standing of the plaintiff in
court. From what has been said in *Squib* agt. *Wyn* (1 *Peere
Wms.*, 378) ; *Elliott* agt. *Collier* (1 *Wils.*, 169, *and* 2 *Kent's
Com.*, 136), it would seem that it is not. At any rate, my
judgment is that under the true construction of what formerly
was the twenty-ninth section of the statute above referred to
it is not ; because, above the conflict of judicial expression in
the books as to whether the husband in a case like the present,
upon the death of his wife, takes a chose in action not reduced
to possession by him during coverture, as husband or as
administrator, there stands forth the universally conceded fact
that, in some way or other, he is entitled to the ultimate
benefit to be derived therefrom because he sustains the rela-
tion of husband. From this it follows as a logical and neces-
sary sequence that his right in this respect, at least by force
of the statute, passes to his personal representatives. That in
a case like the present the administrator or executor of the
estate of the husband, in his representative capacity as such,
may have letters of administration upon the estate of the wife,
was decided in *Matter of Harvey* (3 *Redf.*, 214), affirmed by
the general term of the supreme court ; but that such letters
are not necessary to enable him to maintain an action, was

also decided in *Roosevelt* agt. *Ellithorp* (10 *Paige*, 415), and *Lockwood* agt. *Stockholm* (11 *Paige*, 87).

Whether, therefore, the fund in suit be regarded, for the purposes of determining the question of plaintiff's capacity to sue, as a chose in action, or as property legally in the wife's possession at the time of her death (upon the theory that the possession by the defendant as the wife's trustee or agent under a void trust was not adverse, but in the eye of the law was still her possession), the plaintiff in either case has legal capacity to sue for it.

This brings me to the consideration of the second question, viz., the validity or invalidity in law of the disposition of the money made by Margaret Gilman.

Such disposition constituted neither a gift *inter vivos*, nor a gift *causa mortis*, for the requisites of a gift were wanting. There was no intention of parting absolutely with the title and control, but specific uses were enumerated to which, after the death of Mrs. Gilman and her husband, the money was to be appropriated. By such a disposition Mrs. Gilman sought to create a trust for the uses specified.

In so far as the trust thus attempted to be created has been executed by the payment of funeral expenses and the erection of monuments, the plaintiff does not seek to hold the defendant liable. The controversy relates to that part of it which directs the saying of masses, and the discussion will hereafter be confined to that point.

In England, this use would be held void as a superstitious one, in that country, when land is given, secured or appointed for or toward the maintenance of a priest or chaplain to say mass; for the maintenance of a priest or other man to pray for the soul of any dead man; to have and maintain perpetual obits, lamps, torches, &c., to be used at certain times to help to save the souls of men out of purgatory, the king or queen, by force of certain statutes, is authorized to direct and appoint all such uses to such purposes as are truly charitable (23 *Hen. VIII, chap.* 10; 1 *Edw. VI, chap.* 14; *Bac. Ab. Charitable*

*Uses and Mortmain; D. Duke on Char. Uses*, 105). These statutes were aimed at such usages of the Roman church as were condemned by the Protestant reformation. There is no express English statute, however, making superstitious uses in general void, and the *23d Henry VIII* relates in terms only to assurances of land to churches and chapels. But although there is no present English statute rendering the disposition of personal property for superstitious uses void, the courts of England have, nevertheless, in all such dispositions of property, whether real or personal, held the uses to be void upon general principles of public policy.

In the state of New York and in all the states of the United States, where there is no established state religion, where all religious opinions are free, and the right to exercise them is secured to the people by constitutional guarantees, there is no such statute and no such policy, and I do not hesitate to say that the doctrine of superstitious uses, as enforced by the courts of England, is against the spirit of our institutions, and should not be adopted by our courts. It is a fundamental principle of our law that a man may do with his own as he pleases, provided he does not violate the law nor devote his property to an immoral purpose. Similar views have been expressed by judge TULLY, of Chicago, in *Kehoe* agt. *Kehoe*, and by the surrogate of Kings county, New York, *In the Matter of the Probate, &c., of the Will of Maria Hagenmeyer, deceased*. In these two cases, however, the question presented itself upon a testamentary disposition.

The question of policy having been disposed of, in so far as it rests upon religious grounds, it remains to be seen whether the trust sought to be created is invalid for any reason known to law or equity as administered in this country.

It clearly cannot be upheld as a trust for a charitable use. According to the English law, based upon certain prerogatives of the crown and the statutes of 43 *Elizabeth* (*chap.* 4), the court of chancery in England exercised a certain peculiar jurisdiction over charitable trusts, in determining and apply-

ing gifts to charity where the donor had failed to define them, and in framing schemes of approximation near to or remote from the donor's true design.   Where, therefore, there was a gift for a general and indefinite charitable purpose, either the king under his sign manuel or the court representing him disposed of the subject donated.

The statute of Elizabeth was repealed by the legislature of this state in 1788, and the prerogative of the crown had, of course, no effect in this state; but the powers and jurisdiction of the English court of chancery, as they existed in England at the time of the American revolution, were supposed to have followed and remained with courts of equity in this state, and the law of charities, it was claimed, independent of the statute of Elizabeth, was in force prior to that statute and continued after its abolition.   In the consideration of this subject by the courts of this country it was, however, determined that the English doctrine with respect to charitable trusts, as it existed at the time of the revolution, according to the common law, irrespective of statutory enactment, was only to be considered in force here so far as it was applicable to our circumstances and conformable to our institutions and not repugnant to them.   With this determination the power exercised by the English court of chancery to declare a trust void on the ground that it was for a superstitious use, and to direct the use to a purpose truly charitable wholly ceased to exist in this country.   But a charity must still be a gift: 1. Either for the promotion of science or learning or useful knowledge.   2. Or for the relief of the sick, lame or infirm. 3. Or for the relief of the poor or redemption of prisoners or captives.   4. Or for the building or repairing of bridges, ports, highways, churches or other public structures.   In short, a charity is a gift for a general public use, extending to the poor as well as to the rich, which is free from any personal, private or selfish taint.   The disposition made by Mrs. Gilman of her money cannot be brought within this definition.

Gilman agt. McArdle.

Nor can it be said that such disposition created a trust for a pious use. Such a trust consists of a gift for the dissemination of moral or religious teaching or the promotion of public worship or morality. All gifts falling within this description are regarded as pious uses, and by a broad and liberal construction are enforceable as such in equity. Since the revolution pious uses have been upheld in this country without regard to sect or denominational distinction. The disposition made by Mrs. Gilman does not fall within this class of cases.

On the other hand, it will be found that the trust purpose of the trust sought to be established by Mrs. Gilman is open to no legal objection, because the trust, if it is one, relates solely to personal property, and, as such, is not within the statute of uses and trusts of this state. A trust of personal estate may be created for any purpose which is not illegal, so far as relates to the mere vesting of the legal title to the property in the trustee (*Gott* agt. *Cook*, 7 *Paige*, 521 ; *Burklin* agt. *Burklin*, 1 *Keyes*, 141 ; *Perry* agt. *Foster*, 62 *How.*, 228). So, if the trust were otherwise valid, it would not be a fatal objection that it was not declared in writing (*Martin* agt. *Funk*, 75 *N. Y.*, 134).

But the difficulty with the defendant's case is, that the trust sought to be created by Mrs. Gilman is no trust at all known to law or equity, because there is no beneficiary or *cestui que trust* in existence, or capable of coming into existence under the trust, and that if, for the reason stated, the trust fails, the disposition made of the money cannot stand, because it amounted neither to a gift nor to a disposition by last will and testament. Our statutes describe how the personal property of a person dying intestate shall be distributed. They disclose a well defined policy upon that point. They apply to personal property and choses in action of every description not actually and finally disposed of by the intestate in his lifetime by some mode recognized by law, and they permit no other disposition. Consequently as there was no

will nor a gift, unless a valid trust was created amounting to an actual and final disposition in suit, the law steps in and directs where the money shall go.

Now, as essential to the validity of every trust, there must be four things : 1. A subject-matter. 2. A person competent to create it. 3. One capable of holding as a trustee; and, 4. One for whose benefit the trust is held.

In the present case the first three exist, but the fourth does not. The trustee might be supplied if necessary, for it is a well settled principle in equity that a trust once properly created shall never fail for want of a trustee, and the court can always appoint a person to execute it. But the court cannot supply a beneficiary or *cestui que trust*. Beneficiaries may be natural or artificial persons, but they must be persons in existence or capable of coming into existence under the trust. If they answer that requirement and can be ascertained and identified, it is not necessary that they should be named specifically. In general, any person who is capable in law of taking an interest in property, may, to the extent of his legal capacity, and no further, become entitled to the benefits of the trust.

In the case at bar the beneficiaries are both dead, and beyond the reach of human law. Their souls are intended as the beneficiaries, and the money is to be expended for masses for the repose of their souls. But the soul of one who has departed this life is incapable of taking an interest in the property left behind, nor is it in any sense subject to the jurisdiction of any legal tribunal. A court of equity protects the rights of the living. It cannot extend its jurisdiction to beings which cannot be apprehended within the boundaries of the realm.

For the reasons stated, the trust sought to be created failed for want of a beneficiary. That being so, and there having been neither a gift nor a testamentary disposition, a resulting trust arises by implication of law, under the circumstances of this case, in favor of the plaintiff as the legal representative of

Gilman agt. McArdle.

the husband of the donor, against the defendant, and the defendant must account.

The plaintiff is entitled to judgment declaring the invalidity of the trust and adjudging the defendant liable to account for all the moneys still in his hands. As to all payments made by the defendant in good faith, he is entitled to claim protection.

On a motion for settlement of findings and award of costs and for interlocutory judgment the following opinion was rendered :

FREEDMAN, J. — To correct misapprehension as to the scope of the opinion heretofore filed by me in this case, and to prevent misunderstanding hereafter, I restate the position taken by me.

In entering upon the discussion of the questions relating to the validity of the disposition made by Mrs. Gilman of her money, I commenced by pointing out that according to the law of England *every* disposition of property, real and personal, for the purpose of having masses said, &c., though in form the title is passed, is held void by the courts of that country, namely, a disposition of *real* property by force of certain statutes directed against so-called superstitious uses, and a disposition of *personal* property upon general principles of public policy enforced by the courts. I then held that in the United States there is no such statutes or policy, and that such a policy should not be adopted by the courts.

If, therefore, Mrs. Gilman had made a will and bequeathed her money to her executor for the purpose of having masses said for the repose of her soul or that of her husband, or both, or to a particular church or priest for such purpose, I would certainly have upheld the bequest, because under the testamentary disposition the title would have passed.

So if in her lifetime she had given the money absolutely to a particular church or priest with the request to have masses said, I should not have hesitated to uphold the gift, because the title would have passed.

So if she had given the money to the defendant in this action in such a way that the title passed to him unconditionally and beyond recall, and merely requested him to have masses said, but left it to him whether he would do it or not, I would still have upheld the gift.

But she did none of these things. She attempted to create a trust by parol instructions, and a bare delivery pursuant to such instructions, and yet retain the title to the money. The defendant, who is an undertaker, was to have no interest or benefit in it.

In discussing this *supposed* trust, and noticing the points of counsel made in *this* connection, I showed that, though it was not a trust for a charitable use, nor a trust for a pious use, within the meaning of these terms as known to the law of trusts, the purpose of the trust, viz., to have masses said, was, nevertheless, open to *no* legal objection, but that the difficulty was that the supposed trust was no trust at all which the law can recognize, because there was no longer any person in existence, or capable of coming into existence under the trust, that could call the alleged trustee to an account in a legal tribunal if he should refuse to execute the trust and convert the money to his own use. I should have added here, as an additional reason why it was no trust at all, that there had been no gift or other disposition by which the title passed, for every trust must be founded upon such a gift or disposition. But as I had previously disposed of that question I supposed the reiteration was unnecessary.

It, therefore, will be seen that the case really came down to this: No title passed by either a bequest or gift or legal trust. There was only a mere naked deposit of money into the hands of an agent with certain instructions concerning the employment and payment from time to time of a third person, namely, a Catholic priest, for services to be rendered. In such a case it is a fundamental principle of the law of this state that the principal may at any time revoke the instructions and recover his property; and that if he does not do so

Gilman agt. McArdle.

in his lifetime and dies intestate his death revokes the author- · ity of the agent; and that as the title must go somewhere, it goes to the administrator of the intestate. In such a case the character of the instructions is wholly immaterial. From the moment the administrator objects the agent must cease paying out. He can no more pay for the erection of monuments than he can pay for having masses said. But up to that time he will be protected for acts done in good faith.

Thus it will be seen that if instead of calling for the saying of masses the instructions of Mrs. Gilman had been that the defendant, as her agent, should from time to time employ and pay a suitable person to hoist the American flag on the fourth day of July, in each and every year, over the house in which she died, I would have been bound to render precisely the same decision which I did render.

The findings submitted are settled in strict conformity with these views, and the interlocutory judgment to be entered must also correspond therewith. As to all acts done by the defendant in good faith before the administrator demanded the money he must be protected. But all questions arising in this connection should be determined upon the accounting.

As to costs I can only decide at present that none are to be awarded against the defendant personally. Under the circumstances of the case not only was he almost under a moral obligation to have his rights passed upon by a court of competent jurisdiction, but the question of plaintiff's legal capacity to sue was also a very complicated question. For these reasons I deem it a wise exercise of the discretion vested in me not to inflict costs upon him. All other questions pertaining to costs to be paid out of the fund should stand over without prejudice until the coming in of the report upon the accounting.

In conclusion I wish to state yet that in consequence of the imperfect newspaper report which I had of the case before judge TULLY, I referred to that case as one arising under a will. I have since ascertained, though I have not been able

to procure an authentic report, that it was a case of convey-
ance by deed absolute upon its face, which passed the title as
effectually as a will would have done.